**Delma C. GENTRY, Plaintiff,**

v.

**ASHLAND OIL, INC., Defendant.**

**Civil Action No. 5:87–0364.**

United States District Court,
S.D. West Virginia,
Beckley Division.

Sept. 10, 1996.

---

Richard E. Hardison, Beckley, WV, Robin Jean Davis, Scott S. Segal & John F. Dascoli Segal & Davis, Charleston, WV, for plaintiff.

Larry W. Blalock, Jackson & Kelly, New Martinsville, WV, Michael D. Foster, Jackson & Kelly, Charleston, WV, for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

The parties submitted this case for decision following a *de novo* hearing and filing of proposed findings of fact and conclusions of law. After careful consideration of the hearing transcript, the exhibits and the parties' submissions, the Court concludes Plaintiff is entitled to disability benefits.

## I. INTRODUCTION

The case has a tortuous procedural history. Plaintiff Delma Gentry filed suit in March 1987. On January 11, 1991 the Honorable Elizabeth V. Hallanan granted the motion for summary judgment of Defendant Ashland Oil, Inc., concluding Ashland's denial of disability benefits was neither an abuse of discretion nor arbitrary and capricious.

Gentry appealed the ruling. Finding the record incomplete, the Court of Appeals remanded. Judge Hallanan permitted supplementation of the record on remand. On March 7, 1993 Judge Hallanan reaffirmed the previous grant of summary judgment in favor of Ashland. Again Gentry noticed an appeal.

On December 22, 1994 the Court of Appeals held (1) Judge Hallanan improperly applied an abuse of discretion standard; and (2) Gentry could be entitled to continuing benefits if her disability resulted from physical injuries sustained in a motor vehicle accident in 1979. *Gentry v. Ashland Oil, Inc.,* No. 93–1425, 1994 WL 706212, at *5 (4th Cir. Dec. 20, 1994). Additionally, while most employer denials of benefits are reviewed only for an abuse of discretion, the Court of Appeals directed Judge Hallanan to conduct a *de novo* hearing and to make findings of fact that would determine whether the denial was appropriate. *Id.*

Judge Hallanan concluded the *de novo* hearing on September 21, 1995. Following the hearing, the parties submitted cross briefs and proposed findings of fact and conclusions of law. The case was submitted for decision October 17, 1995. Because of a perceived conflict of interest, Judge Hallanan recently transferred the case to this Judge. The undersigned conducted a status conference in late June and directed the parties to submit additional, limited briefing by mid-July.[1] The case is ripe for resolution.

## II. FINDINGS OF FACT

1. Plaintiff Delma Gentry now is approximately 62 years old. She is a high school graduate who took some college hours and additional seminar training. It is undisputed she was a good student. In 1979, she began working for Hobet Mining Company, a subsidiary of Ashland.

2. There she was a Scalehouse Clerk. Her job duties included timekeeping, equipment reporting, weighing of trucks, preparing truck tickets and other equivalent work.

---

1. On July 22, 1996 Plaintiff submitted a new item of evidence authored by Dr. Robert Keefover. While Defendant objects to the consideration of this new evidence, the Court has reviewed the document and allows it as a further supplement to the record.

Gentry also performed payroll duties that, at one time, involved a 400 person workforce.

3. Gentry was injured in an automobile accident on February 19, 1979. In the occurrence, Gentry's head struck the windshield, rendering her unconscious. She was treated at a hospital emergency room.

4. Previous to the accident, Gentry was a faithful employee.[2] Her only prior visit to a hospital was for the birth of her son. She suffered no mental or emotional problems antedating the accident and seldom was she ill. After the accident, however, she began manifesting unusual symptoms. Foremost among these were frequent debilitating headaches that forced her to the emergency room for treatment on many occasions. In the words of a clinical psychologist, the accident precipitated Gentry's " 'downhill trend.' " Exhibit 3, letter of Jim Rubin (Dec. 9, 1983).

5. In addition to her headaches and other symptoms, Gentry began noticing a marked decrease in her cognitive functioning. She had difficulty concentrating on her work, suffered significant memory problems, slightly impaired speech and she experienced difficulty in remembering words. She later resorted to carrying a word list as a relearning aid. According to her treating psychiatrist, Gentry additionally began experiencing severe depression associated with the recurrent headaches. She gradually realized she could not perform her work as before and began taking it home and having a friend help her complete it.

6. Gentry worked full-time until 1981, but utilized available sick days. She ceased work on June 6, 1981, never to return. On July 28, 1981 Gentry applied for disability benefits under Ashland's Long Term Disability Plan.

7. Ashland paid benefits to Gentry for a period of two years from September 2, 1981 through September 1, 1983, when it terminated the payments based on the Plan's limitation for mental or emotional conditions:

> If your disability is related to mental or emotional conditions, benefits will be paid only for a period of 24 months. Benefits will not be continued after 24 months of payments unless you are confined in a hospital or other institution.

> The term 'mental or emotional' includes neurosis, psychoneurosis, psychopathies, psychosis, and any other mental or emotional disease or disorder of any type.

Ex. A to Def.'s Mot. for Summ. Jgt. filed May 13, 1988.

8. Since the accident, Plaintiff was hospitalized on occasion for depression and other ailments. These hospitalizations were (1) February 18 to March 2, 1982; (2) July 19 to July 30, 1982; (3) September 1984 for an undisclosed period; (4) July 22 to August 3, 1985; (5) February 29 to April 6, 1988; and (6) April 1988 for an undisclosed period.

9. Gentry's mother suffered from a mental illness.[3] Gentry also had other psychosocial stressors, including (1) an ongoing illness suffered by her husband, who subsequently died in or about 1987, and (2) the eventual need to institutionalize her mother, who had lived with Gentry for many years.[4]

---

2. She refused substantial treatment at the emergency room after the accident to attend to her work and domestic responsibilities. *See, e.g.,* Joint ex. 3, letter from Dr. Johnny Dy (June 6, 1984); *id.,* report of Dreama Baker, M.A. (Feb. 15, 1984); *id.,* letter from Dreama Baker (Oct. 9, 1991) (quoting Gentry as saying " 'When I got hurt I was a determined person and I wanted to go back to work. I did, too. I had bad headaches and I couldn't remember anything.' "); Joint ex. 1, Deposition of Dr. Sidney Lerfald at 58.

3. Gentry's medical history suggests her maternal grandmother too suffered from mental illness. The Court finds to the contrary, however, based on Gentry's credible testimony:

Q Yes, ma'am. And your grandmother also had a history of mental problems, did she not?

A No. We can't understand that. I have called everyone and my brother. She lives on, sir, because of her—I can't say that word—being so stable in life. She could even get along with the devil. And that's no joke. Where did that come from?

Transcript of *De Novo* Hearing Before the Honorable Elizabeth V. Hallanan 36 (Oct. 2, 1995) (hereinafter "T. at ——"). The Court discredits Ashland's hereditary mental illness theory.

4. Indeed, there is credible evidence these stressors had far less impact on Gentry than some of her physicians might have guessed. *See* T. at 21, 35 (Gentry's testimony); T. at 95 (Dr. Richard Alexander's testimony he "saw nothing unusual about the way she grieved for her husband six months after. And I thought her grief there was fairly appropriate.").

10. On July 8, 1983 Gentry was awarded disability insurance benefits by the Social Security Administration. Gentry complained about nervousness, depression and her "almost constant severe migraine headaches." Def.'s ex. 1. The ALJ found Gentry suffered from frequent severe headaches and a recurrent and severe major affective disorder. *Id.*

11. A 1984 MMPI [5] administered to Gentry contained elevated scores for hypochondriasis, depression, hysteria, psychopathic deviancy, paranoia, psychasthenia, and schizophrenia.[6] While Ashland attempted to paint these elevated scores as determinative of the psychiatric, rather than physical, origin of Gentry's disability, Dr. Steven Dreyer testified the scores could be consistent with a person suffering both an emotional disturbance or "major physical problems." Joint ex. 2, dep. of Dr. Steven Dreyer at 31; *see also* Lerfald dep. at 12–13 (stating the elevated scores could "indicate a number of things" including "any number of physical problems that mimic" certain psychiatric illnesses).

12. CT scans, EEGs and MRIs did not reveal any organic abnormality in Gentry. The Court, however, does not find this determinative, nor very helpful, in tracing her disability's origin. *See* Lerfald dep. at 41 (stating even if an EEG is "normal, it doesn't exclude the possibility of a head injury ... [or] a seizure disorder"); T. at 96, 107–08 (Dr. Alexander testifying negative readings on an EEG, CT scan or MRI do not preclude the presence of organic damage).[7]

13. The parties agree Gentry is disabled pursuant to the Plan. There is also apparent agreement that both psychiatric and organic/physical processes are affecting Gentry.[8] Gentry's disabling condition, however, is not her depressed mood, alleged bipolar disorder or other arguably psychiatric conditions. It is her day-to-day struggle with the lingering effects of the head injury sustained in the accident, namely the marked impairment in her cognitive functioning and her now less frequent headaches.[9]

14. This finding is supported by strong medical evidence, including:

A. An April 9, 1984 letter from Dr. Hasan stating Gentry (1) had "periodic bouts of severe depression associated with migraine and tension headaches[;]" (2) had "some degree of organic impairment, which is affecting her speed, her memory, and her ability to work without tiring[;]" and (3) "may have a dull brain dysfunction stemming from some brain damage earlier." [10]

---

5. The MMPI is shorthand for the Minnesota Multiphasic Personality Inventory. It is a 550 "yes or no" question personality test with subject areas spanning from politics to marital problems. *See* J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* M–210 (1996). The subject's responses are compared to answers by other groups of people. *Id.*

6. Hypochondriasis is defined as a "chronic ... condition or state of mind in which the person is excessively fearful and anxious about his health, believing himself to be afflicted with serious ailments." 2 J.E. Schmidt, *Attorney's Dictionary of Medicine and Word Finder* H–242 (1995). Psychasthenia is a "mental disorder of the neurosis type marked by compulsions to perform senseless acts which the subject recognizes as silly or irrational, obsessions with haunting ideas, anxieties, abnormal fears, etc." *Id.* at 3–P–361.

7. After stating this medical opinion, Dr. Alexander pragmatically made the point in descriptive lay terms:

I have a patient who within six months went from being able to function as a bookkeeper, being able to keep a payroll with taxes and all that, to who now we have to make sure the stove doesn't get turned on because she might forget it, who can't balance a checkbook, has no concept of the function or use of money. I don't need a Cat Scan.
*Id.* at 97.

8. Indeed, Ashland appears to concede Gentry's organic deficits were present at least as early as February 1984.

9. The ALJ found as much over 13 years ago, stating "[h]er headaches are of such severity as to markedly interfere with the claimant's ability to concentrate, understand, remember and carry out instructions." Def.'s ex. 1.

10. Dr. Hasan's and other physicians' early treatment notes and correspondence with Ashland appear to conclude Gentry's primary condition was mental or emotional in nature. It is abundantly clear, however, that Dr. Hasan and others were not made aware of the accident until December 1983.

Foreknowledge of the diagnosticians of the head injury resulting from the accident is significant for proper diagnosis. Dr. Hasan and others cannot be faulted for filing early, incomplete diagnoses prior to learning of the accident nor for later modifying their opinions after becoming

*Id.*

B. Results of 1984 neuropsychological testing and interviews by clinical psychologist Dreama Baker finding: (1) "[Gentry's] emotional difficulties began subsequent to [the accident, including].... difficulty concentrating on her work, ... difficulty remembering words ... [requiring her to carry around] a word list in order to relearn words[;]" (2) performance on a Halstead–Reitan Neuropsychological Examination (hereinafter "the HRNE") was "strongly suggestive of organic brain damage[;]" and (3) the presence of a possible "cerebral impairment to the right cerebral hemisphere." Joint ex. 3, report of Dreama Baker (Feb. 15, 1984).[11]

C. Results of neuropsychological testing from July 1985 by Steven Dryer finding "moderate to severe cortical impairment.... [and a deterioration of cognitive capacities] consistent with a closed head injury in which the left fronto-parietal areas experience more impairment than other areas of her brain." *Id.*, report of Dr. Steven Dreyer (Jul. 9, 1985).[12]

D. A July 10, 1988 report by Dr. Richard Alexander, Gentry's primary care physician, stating he had referred her to a specialist, Dr. Robert Keefover, because her treatment with psychiatric medications failed to control her symptoms. Following referral and a medication change, Alexander stated as follows:

> The medical regiment [sic] she is now on, and has made such dramatic progress with is not one of psychiatric medications, but rather seizure medications. This patient has a post-traumatic partial-complex seizure disorder. The seizures ... manifest themselves with the right sided rigidity and cerebral dysfunction which is giving the psychiatric manifestations. The history and the gradual onset of symptoms is consistent with this type of injury and her failure to improve after eight years of psychiatric medications and treatments further suggests she does not have a psychiatric

aware of Gentry's full medical history. Further, the Court credits evidence from the earliest days of Gentry's treatment concerning the presence of her serious headaches and memory failures. As will become apparent, these manifestations result from partial complex seizure disorder, post-traumatic neurological syndrome and/or post-concussive dementia.

Ashland attributes a nefarious motive to Gentry for failing to bring the accident to Ashland's or her physicians' attention until shortly after her disability benefits were initially terminated. The Court does not adopt Ashland's postulate.

11. The HRNE results are a pivotal consideration for the Court, as they were for Ms. Baker: "Using Halstead's cut-off points[,] brain damaged subjects make *fifty-one* or more errors on the Category Test.... *Her 111 errors* on the Category Test are problematic[, because the] Category Test is probably *the most sensitive test around to assess the biological functioning of the adult brain." Id.* (emphasis added). Ms. Baker also noted shortly after the accident Gentry had trouble writing out checks, an unusual inability to concentrate at work, irritability, impatience and other curious manifestations.

Ms. Baker's right cerebral hemisphere finding is inconsistent with later findings by other medical personnel indicating impairment to the left hemisphere. This discrepancy is not significant for credibility purposes because the remainder of Ms. Baker's report is thorough and well-reasoned.

Ms. Baker performed further testing on Gentry and filed another report on October 9, 1991. In her report, Baker noted (1) Gentry's psychiatric symptoms likely were secondary to head trauma from the accident; (2) a decline in certain areas such as memory and performing routine chores; (3) the presence of "Parkinsonian-like features" that were not as evident in 1984. Joint ex. 3, report of Dreama Baker (Oct. 9, 1991).

12. Dr. Dreyer conducted further tests in early 1986 and mid–1987. The 1986 testing indicated a slight decrease in Gentry's performance. This caused some rethinking for Dr. Dreyer concerning his 1985 diagnosis because "an ongoing deteriorative process suggests that there is more than just the [accident] involved as part of the deteriorative process. From a pure traumatic standpoint, she would be expected to have leveled off and perhaps have demonstrated some improvement over time." *Id.*, report of Dr. Steven Dreyer (Mar. 14, 1986). This is consistent with some of the medical testimony at the *de novo* hearing that head injury patients are typically expected to be at their worst shortly after the accident and gradually improve or level off thereafter. *But see* Lerfald dep. at 56; Dreyer dep. at 79–81. Such improvements were noted during the mid–1987 testing, and Dr. Dreyer thus discounted his earlier fears there was a deteriorative process, perhaps similar to Alzheimer's disease or Parkinson's syndrome, in addition to the traumatic impairment from the accident.

illness. The fact that she has made such dramatic improvement on her current medications for seizure control strongly supports the clinical diagnosis of post-traumatic-partial-complex seizures.

Seizure disorders secondary to head injuries are very difficult to diagnose and are often difficult to treat. There does not need to be much tissue damage to the brain to cause major damage. This damage, probably scar tissue will alter the electrical transmissions within the brain causing the seizure disorder and motor/cerebral dysfunction.

I do not see any evidence of intrinsic psychiatric disorder, but rather psychiatric symptoms from her seizures.

Joint ex. 3, report of Dr. Richard L. Alexander (Jul. 10, 1988).

13. A later report from Dr. Keefover dated October 20, 1989 confirmed his earlier suggestion of partial complex seizure disorder and stated the anti-seizure medication she was substituted improved her mood, coherency of conversation and diminished the recurring headaches. He continued in his belief Gentry had some cognitive disabilities relating to the accident, as well as some psychological manifestations.

The most recent submission from Dr. Keefover, who is now director of the neuropsychiatry program at the School of Medicine, is a letter to Plaintiff's counsel dated June 10, 1996. Dr. Keefover states as follows:

I have been seeing Mrs. Gentry for several years because of an apparent seizure disorder and behavioral disturbances secondary to a closed head injury.... She has also exhibited episodic behavioral changes strongly suggestive of partial complex seizures. [Her] ... symptoms have improved somewhat in recent years following the institution of an anticonvulsant medication. Nonetheless, on multiple occasions the patient has been transported to an emergency facility or to her primary care physician's office for treatment of her spells. She has also apparently been found dazed and/or immobilized by confusion when friends or family have entered her home.

Letter from Dr. Robert Keefover (June 10, 1996).

14. Dr. Mooney also co-authored a September 14, 1995 letter with Dr. Hasan detailing Gentry's condition. The letter provides as follows:

Ms. Gentry has been seen at this clinic since 1982. Ms. Gentry was involved in an auto accident in 1979. She was treated at the Plateau Medical Center following the accident for lacerations on her head as well as chest injuries. She was readmitted less than a week later for possible fractures of the spine and leg.

E. A December 15, 1987 report from Dr. Robert Keefover, then an assistant professor of neurology and psychiatry at the West Virginia University School of Medicine. The report suggests the presence of partial complex seizure disorder and a post-traumatic neurologic syndrome manifested by migraine headaches, mood instability, impaired attentiveness, registration and calculation and a mild impairment of her expressive and understanding skills.[13]

F. The testimony of Clinical Psychologist Dr. Roger Mooney that (1) Gentry suffers from dementia associated with head trauma; and (2) the psychological disorder she manifests is related directly to the accident.[14]

G. The deposition testimony of Dr. Sidney Lerfald, Gentry's other treating psy-

When seen in 1982, the patient complained of being significantly depressed much of the time and migraine headaches. Initially, she was treated with antidepressants with little relief of the symptoms. Ms. Gentry complained of problems with concentration, clumsiness and irritability. The patient was seen by our staff psychologist in 1984 and the [HRNE] was administered. The results were indicative of significant neurological involvement. Problem solving ability, reasoning, concept formation and incidental memory were impaired. Since that time, the work-up done at West Virginia University has supported the findings.

Before the accident, the patient had a strong work record. She reported having worked for eight years without missing any more than one-half day and doing her job "well". Since that time, the patient has functioned marginally. She has difficulties with day to day tasks due both to the memory deficits and poor physical coordination. She has a history of seizures and based on self report, the last seizure was earlier this month. Ms. Gentry continues to have bouts of depression and emotional outbursts. She keeps notes at home to help with the daily chores and as a means of monitoring her progress. She is seen by our clinical psychologist bimonthly.

The staff psychologist believes within a reasonable degree of psychological certainty that most likely the brain damage results from the auto accident in 1979. I believe within a reasonable degree of medical and psychiatric certainty that the brain damage most likely results from the auto accident in 1979.

Joint ex. 3, letter from Dr. M. Khalid Hasan and Dr. Roger P. Mooney (Sept. 14, 1995) (emphasis added). According to Gentry, these two doctors have collectively treated her longer than any other physician and/or psychologist.

chiatrist, that Gentry has a "post-concussive dementia." [15] Lerfald dep. at 54.

15. Dr. Richard Blonsky, a board certified neurologist, was a contractor with a third-party plan administrator who indirectly reviewed Gentry's case for Ashland and testified at the *de novo* hearing. For several reasons, the Court accords virtually no weight to Dr. Blonsky's testimony. First, Dr. Blonsky was quick to criticize other treating physicians who concluded Gentry's disability resulted from injuries suffered in the accident. While acknowledging the presence of an organic deficit, however, he was hesitant to "venture a guess" as to an alternative diagnosis explaining the deficit. T. at 143.

Second, Dr. Blonsky opined the cognitive deficits were not evident from 1981 to 1983. This conclusion is insupportable and directly contradicted by the very credible testimony of, *inter alia*, both Gentry and Dr. Dreyer. Blonsky's opinion also contradicts the Social Security ALJ's finding of such deficits and his award of benefits effective June 5, 1981.[16] Third, Dr. Blonsky appears to have assumed Gentry was performing her job adequately from 1979 to 1981. Again, this contradicts Gentry's reliable history of her need to take work home and get assistance from a friend. Fourth, Dr. Blonsky issued his opinion to Ashland the same day he received the file in this protracted and complicated case. The inference of a hasty and unreasoned conclusion is further warranted when one considers Dr. Blonsky also found time to issue opinions in other cases the very same day. Finally, and perhaps most significant, Dr. Blonsky

never met Gentry, much less examined her. He further failed, in the face of conflicting medical evidence, to suggest she be given an independent medical examination or neurological work-up to pin down the cause of her deficits. For these reasons, Dr. Blonsky's testimony is rejected.

### III. CONCLUSIONS OF LAW

1. When she was injured, Gentry was a member of Ashland's Plan, which is an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1002(3).

2. The Court of Appeals in *Gentry* explicitly directed this Court to conduct a *de novo* hearing and to make findings of fact that would determine whether the denial of Gentry's benefits was appropriate. In essence, as Judge Hallanan observed, the Fourth Circuit intimated this Court should stand in the shoes of the Plan administrator.

3. Based on a thorough review of the record, the Court concludes Gentry is disabled within the meaning of the Plan.

4. Gentry's disabling condition is not her alleged psychosocial stressors, depressed mood, bipolar disorder or other arguably psychiatric conditions.

5. Her disability is the lingering effects proximately resulting from the head injury sustained in the accident.

6. Given this conclusion, Gentry does not fall within the Plan's limitation for treatment of mental or emotional conditions. She is

---

15. Dr. Lerfald also opined that a physical injury could make bipolar disorder, typically considered an excludable mental or emotional condition, more resistant to treatment or even cause or exacerbate the disorder. *Id.* at 63, 27; *cf.* Dreyer dep. at 20 (noting the occurrence of chemical changes following a head injury). In an October 28, 1987 letter, Dr. Lerfald surmised Gentry continued "to suffer what appears to be a post-concussive dementia.... with a bilateral cortical impairment with the left cortical hemisphere significantly more impaired than the right. Based on her history, it would appear that these deficits are the direct result of the automobile accident she had in 1979. *Adequate treatment of her mood disorder has not improved these clear cut deficits.*" Joint ex. 3, letter from Dr. Sidney Lerfald (Oct. 28, 1987) (emphasis added).

Ashland vigorously asserts Dr. Lerfald believes Gentry's primary problem is her bipolar disorder, which it asserts is unrelated to the accident. Assuming this characterization of the evidence is accurate, the weight of medical opinion is to the contrary. *See, e.g.,* T. at 101 (testimony of Dr. Alexander disagreeing with Dr. Lerfald that bipolar disorder is Gentry's principal diagnosis); T. at 76 (testimony of Dr. Mooney questioning whether Gentry even has bipolar disorder).

16. The ALJ stated Gentry "suffers from tension headaches and frequent, severe migraine headaches. Her headaches are of such severity as to *markedly interfere with the claimant's ability to concentrate, understand, remember and carry out instructions.*" Def.'s ex. 1 (emphasis added).

thus entitled to an award of past and continuing disability benefits. *See Gentry*, 1994 WL 706212, at *5.

7. Accordingly, Gentry shall be **AWARDED** these benefits with interest on all past due installments.

### IV. CONCLUSION

Based on the foregoing, the Court finds in favor of Plaintiff and **AWARDS** her past and continuing disability benefits with interest. Plaintiff may file an appropriate fee petition pursuant to 29 U.S.C. § 1132(g)(1) and *Rule* 54(d)(2), *Federal Rules of Civil Procedure*.[17] This case is **DISMISSED WITH PREJUDICE** and stricken from the docket.

---

**17.** Plaintiff's fee petition should, at a minimum, (1) provide dates work was performed, (2) a reasonable description of the work, (3) time expended on the work, and (4) an affidavit or affidavits showing the requested hourly rate is reasonable. Further, pursuant to *Rule* 54(d)(2)(B), *Federal Rules of Civil Procedure*, the petition "shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made." *Id.* In preparing the petition, counsel is encouraged to refer to this Court's recent decision in *Continental Casualty Co. v. Assicurazioni Generali, S.P.A.*, 903 F.Supp. 990 (S.D.W.Va.1995) and other relevant precedent from the Court of Appeals.